UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X
                                                                          :
JERRY BONTON                                                              :          08-CV-526 (ARR)
                                                                          :
                              Petitioner,                                 :          NOT FOR
                                                                          :          PUBLICATION
             -against-                                                    :
                                                                          :          OPINION AND ORDER
ROBERT ERCOLE, Superintendent, Green Haven                                :
Correctional Facility,                                                    :
                                                                          :
                              Respondent.                                 :
                                                                          :
------------------------------------------------------------------------- X

ROSS, United States District Judge:

On January 31, 2008, *pro se* petitioner, Jerry Bonton, brought the instant action for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in the Supreme Court

of the State of New York, Kings County, following a jury trial, of one count of murder in the first

degree and one count of murder in the second degree. See Pet. at 1 (Dkt. No. 1). Petitioner

argues that (1) the evidence at his trial was legally insufficient to support a conviction of murder

in the first degree, (2) the trial court erred in allowing the prosecutor in this capital case to inform

several potential jurors during voir-dire that first-degree murder is the only crime for which life

imprisonment without parole is authorized by New York law, (3) the trial court violated his

confrontation rights by not affording a full and fair opportunity to cross-examine a prosecution

witness, (4) the trial court violated his due process rights by admitting evidence of past

uncharged crimes, and (5) the trial court violated his due process rights by improperly annotating

the verdict sheet. See id. at 3-12. For the reasons that follow, the petition is denied.

1

## BACKGROUND

On November 13, 1995, three males entered apartment #C4 at 417 Ocean Avenue, in Brooklyn, New York, and shot and killed Harold Burton and Worell Brown. Petitioner was arrested and charged with several counts of murder in the first and second degrees, in violation of N.Y. Penal Law §§ 125.27[1][a][vii], 125.25[1],[3]. Prior to the trial, the prosecutor filed a notice of its intent to seek the death penalty. After a lengthy jury selection that began on October 25, 1999, petitioner's three-week trial commenced on March 7, 2000. On April 1, 2000, at the conclusion of the guilt phase of the prosecution, he was convicted of one count of murder in the first degree for the murder of Harold Burton and one count of murder in the second degree for the murder of Worell Brown. On April 11, 2000, in lieu of proceeding to the penalty phase of the trial, petitioner agreed to accept a sentence of life imprisonment without parole on the first degree murder conviction and waived his rights to appeal his conviction or seek state-court collateral review. Accordingly, he was sentenced to a term of life in prison without the possibility of parole on the first count, to run concurrently with a term of twenty-five years to life on the second count.

In October of 2003, petitioner filed an appellate brief with the New York Supreme Court, Appellate Division, raising the five issues he now raises before this court. See App. Br. of Jerry Bonton, submitted as Ex. E to Resp.'s Opp. (Dkt. No. 4) (hereinafter "Pet.'s Br."). On May 10, 2004, the Appellate Division affirmed the judgment without reaching the merits, holding that petitioner had voluntarily and intelligently waived his right to appeal. See People v. Bonton, 7

2

A.D.3d 634 (2d Dept. 2004). The New York Court of Appeals denied petitioner's request for leave to appeal on August 2, 2004. See People v. Bonton, 3 N.Y.3d 671 (2004).[1]

On January 31, 2008, petitioner filed the instant action, urging this court to grant him a writ of habeas corpus based on the five grounds he raised in his direct appeal. He provided no further elaboration of his arguments beyond the text of the brief he presented to the Appellate Division. On April 11, 2008, respondent opposed the petition, see Dkt. No. 4, but petitioner filed no reply. In addressing the merits of the five issues raised, the court will therefore rely on the arguments made on direct appeal by petitioner's counsel.

Respondent concedes that, for purposes of this case, "the deferential standard of 28 U.S.C. § 2254(d) does not apply to [any of the] claim[s] [in this petition] because the Appellate Division did not reach the merits of [any] claim." See Resp.'s Mem. in Opp. at 20, 44, 55, 71. Therefore, the court will "apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims." Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2003). The facts relevant to each claim will be set forth in turn below.[2]

_____

[1] Thereafter, petitioner twice moved unsuccessfully before the New York Supreme Court, Kings County, to vacate his conviction pursuant to N.Y. Crim. Proc. L. § 440.10. Those proceedings are not relevant to the instant petition.

[2] As respondent makes no claim that this court is procedurally barred from addressing petitioner's claims on the merits, this court is required to do so. See Trest v. Cain, 522 U.S. 87, 89 (1997). This is so despite the unusual posture of this proceeding. Because the Appellate Division relied on petitioner's waiver of appeal in refusing to reach the merits of his claims, the instant habeas proceeding is, in effect, petitioner's first appellate forum.

## DISCUSSION

### I.    The Sufficiency of the Evidence

Petitioner argues that the evidence presented at trial was legally insufficient to support a conviction of murder in the first degree. See Pet. at 7. Because, as respondent concedes, the Appellate Division did not reach the merits of this claim, the pre-AEDPA standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979), applies. Under Jackson, the court must not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 318-19 (emphasis in original) (citations omitted). Moreover, the habeas court must not conduct a credibility assessment in reviewing the sufficiency of the evidence. In fact, "a conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness' credibility." Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (quoting United States v. Strauss, 999 F.2d 692, 692 (2d Cir. 1993)). Thus, "[a]n appellant challenging the sufficiency of the evidence [of a state court conviction] bears a very heavy burden." Einaugler v. Supreme Court of the State of New York, 109 F.3d 836, 840 (2d Cir. 1997) (quoting Quirama v. Michele, 983 F.3d 12, 14 (2d Cir. 1993)).

Finally, it is settled that the habeas court must determine the sufficiency of the evidence with reference to the elements of the crime that must be proved under state law. See Jackson, 443 U.S. at 324, n. 16. Under New York law, to be convicted of first-degree murder under the statute charged, the state had to prove beyond a reasonable doubt that petitioner, with intent to kill, caused Harold

4

Burton's death in the course of and in furtherance of an enumerated felony, in this case, burglary. See N.Y. Penal Law § 125.27[vii].

At trial, the state offered the eye-witness testimony of Nerick Nelson and Kanisha Palmer, both Jamaican nationals who were acquainted with another Jamaican they knew as "Stripper," Tr. at 83-85, 90:18-25, 624-27, whose real name was Harold Burton. Tr. 499:3-12.[3] At some point in their friendships with Burton, Burton introduced both Nelson and Palmer to another Jamaican nicknamed "Bunny" and/or "Matic." Tr. at 93:18-24, 627:19-628:10. Matic's real name was Worrell Brown. Tr. 491:5-492:4, Tr. 496:15-18.

Burton resided at 417 Ocean Avenue, Apt. #C4 in Brooklyn, New York, Tr. 91:14-23, 627:9, an apartment from which he frequently sold marijuana. Tr. at 97:16-17. Around 3:00 p.m. on November 13, 1995, Nelson went to Burton's apartment, where he joined Burton and Brown cooking in the kitchen. Tr. 103-105. About a half hour later, Burton left the apartment, Tr. 105:14-17, and still another half hour later, Nelson and Brown were joined by Palmer and her young brother, Darryl, Tr. 114-116; 629:14-24. Darryl went into the bedroom on the right side of the apartment to watch TV while Palmer, Brown, and Nelson continued to cook in the kitchen. Tr. 116, 630:12.[4] Soon thereafter, Burton returned to the apartment accompanied by two armed men, both of whom had nine-millimeter guns. One of the men "had [Burton] by the collar," and was pointing his weapon at Burton, demanding to know where he could find Burton's marijuana. Tr. at 117:22-23, 122:16-18.

---

[3]     References to Tr. are to the Trial Transcript, submitted in twelve volumes as Exhibit C to respondent's motion in opposition to the petition for writ of habeas corpus. See Dkt. No. 4.

[4]     The witnesses described the apartment as having two bedrooms, one to the left of the main entrance and one to the right, as well as a small kitchen and a bathroom, located at the end of a narrow hallway directly in front of the entrance to the apartment. Tr. 100:15-101:15.

Nelson testified that the apartment hallway and kitchen were well lit, and that there was nothing to obstruct his view of the two strangers. Tr. at 116:15-20, 118:-8-24. Thus, he was able to describe the men's age, weight, and race; he and Palmer also testified that they recognized their accent as Jamaican. See Tr. at 119, 122:20, 637:13-15. Nelson then provided an in-court identification of petitioner, Jerry Bonton, as the man who was holding Burton by the collar and pointing a nine-millimeter gun at his face. Tr. at 124:14-24.

The two men ordered Brown, Nelson, and Palmer to lay down on the kitchen floor. Tr. 127-128. Palmer crouched under the kitchen table and Nelson lay on the floor facing the kitchen door and the hallway leading out of the apartment. Petitioner, still holding Burton by the collar, took him to the rear of the kitchen and there pressed him against the stove. Tr. 638:9-22. Petitioner once again asked Burton where the marijuana was, but Burton assured him that there was no marijuana in the apartment. Tr. 135. Nelson, who could still see petitioner and Burton behind him out of the corner of his eye as he lay on the floor of the small kitchen, testified that petitioner then left the kitchen and called a third man into the apartment, whom petitioner referred to as Kanarki. Tr. at 137. Petitioner handed the gun to Kanarki and disappeared into the bedroom on the left side of the apartment, where Nelson could hear him rummaging through the furniture. Tr. at 140:12-24. Petitioner returned and retrieved the gun from Kanarki, and again demanded that Brown, Burton, Nelson, and Palmer tell him where the drugs were. Tr. at 143.

Nelson testified that he could once more see petitioner standing near Burton at the rear of the kitchen, behind where Nelson lay on the floor. Tr. at 145. As petitioner continued to demand the location of the drugs, Burton repeatedly asked him to "take the gun out of [his] face," at the same time swatting at the gun in an attempt to deflect it. Tr. 145:15-16. Nelson could see the other two

6

men (the original armed gunman and the man named Kanarki) standing in front of him near the entrance to the kitchen; Kanarki had his foot near Nelson's right shoulder to hold him on the floor. Tr. at 146. As the scuffle between Burton and Bonton continued, Nelson heard a shot fired behind him, Tr. 148:18-19, and he testified that neither the second gunman nor Kanarki fired it, Tr. 148:23-24. He also saw Burton's body beginning to fall after he heard the first shot. Tr. 149. Nelson then somehow pushed Kanarki's foot out of the way and began to crawl towards the small bathroom adjacent to the kitchen in order to escape. Tr. 149-50. He heard two more shots coming from the kitchen area when he was in the bathroom, but did not see who fired them. Tr. 151:6. Palmer testified that she heard several shots coming from within the kitchen at some indeterminate point after she had crouched under the table. Tr. at 640-41. Shortly after the first shots were fired, Burton fell face down on her legs under the table, bleeding profusely. Tr. at 643-44. Some time later, she heard footsteps leaving the kitchen so she pushed Burton off her leg by turning him over and climbed out from under the table. Tr. at 646. She saw Brown dead on the floor and she quickly left the kitchen to find her brother Darryl. They then left the apartment. Tr. 646-47.

Meanwhile, Nelson had been unable to escape through the bathroom because of a locked gate blocking the bathroom window; he was also unable to find a way out through the bedroom on the left side of the apartment. Tr. 152-53. When some moments later he heard footsteps leaving the apartment, he walked back into the kitchen where he found Brown lying on his stomach in a pool of blood, with blood foaming from his mouth, and Burton in the area near the stove where he had fallen, now on his back, twitching and bleeding from his face. Tr. 153-54. Nelson then left the apartment. Tr. 155. The prosecution also offered the testimony of Cecil Bishop, who lived in apartment B4, directly under Burton's C4. Tr. 475. He testified that sometime around 7:30 p.m. on

7

November 13, 1995, he heard two gunshots followed by a voice screaming "ow, ow," and then heard at least one more gunshot. Tr. 477:21-478:2.

Detective John J. DeGuilio of the New York City Crime Scene Unit responded to the scene at 417 Ocean Avenue around 8:30 p.m. that night. Tr. 339:24. Detective DeGuilio recovered three 9 millimeter bullet shells from the kitchen in apartment C4, Tr. 373:11-13. No shells were found elsewhere in the apartment. Tr. 377:3-4, 431:22-24. The prosecution's ballistics expert, Detective Steven Fiorica, determined that all three shells were fired from 9 millimeter guns, and that two of the three were fired from the same weapon. Tr. 1031:6-13.

DeGuilio also found eight latent fingerprints throughout the apartment, including one on the exterior of the cabinet door below the kitchen sink. Tr. 384:22, 392:21-25. The print was identified by Detective William Goellner, an NYPD expert in fingerprint analysis, as belonging to petitioner, Bonton, see Tr. 556-563.[5]

The prosecutor offered the expert testimony of Dr. Beverly Lefferts, a forensic pathologist in the office of New York City's Chief Medical Examiner, who conducted the autopsy on Burton and Brown. Tr. at 844-45. She testified that Brown had a single gunshot wound on the left side of the head and that the bullet went into his head, into the brain, and lodged itself in the upper part of the neck, where Dr. Lefferts recovered it. Tr. 853:8-12. She indicated that the injury to the brain

---

[5]     Detective Goellner testified that, in his expert opinion, the latent fingerprint lifted from the cabinet door below the kitchen sink matched a print obtained from defendant upon his arrest in October of 1997 under the name of Garfield Bryan. Tr. at 556:15-557:8, 558:3-7, 562:5-9, 613-14. Detective Goellner also testified that this latent fingerprint matched defendant's fingerprints, taken immediately before the beginning of the trial. Tr. 466:1-14, 563. He then testified that petitioner's fingerprints also matched the fingerprints on the Garfield Bryan fingerprint card, confirming that Bonton and Bryan were the same person. Tr. 563:5-11. Goellner attested that he was "one hundred percent sure" about his conclusion that all the fingerprings matched. Tr. 562:2-8.

caused by the gunshot wound would have almost certainly rendered Brown immediately unconscious, and that it was the cause of death. Tr. 860:2-7, 15-18, 863:6-14.

Dr. Lefferts also performed the autopsy on Burton. She described three gunshot wounds by location of entrance and exit of the bullet, although she was not able to ascertain the order in which the wounds were made. Tr. 868:11-17. One wound was on the left side of Burton's face, just below the mouth. Tr. 868:24-25. The bullet traveled from his face through his neck, severing the carotid artery, and then exited through upper part of his right shoulder. Tr. 871:22-25.[6] Because the carotid artery is a major blood vessel that supplies blood to the brain, its perforation would have caused a great deal of bleeding into the throat and from Burton's body, as well as loss of consciousness "over a short period of time." Tr. 873:9-20. Because there was no burning or stippling around this wound, Dr. Lefferts opined that it was caused by a gun fired from more than 12 to 18 inches away. Tr. 881:24-882:3. The second wound was caused by a bullet that entered the left side of Burton's torso and exited from his right side a little higher than where it had entered, but it did not hit any major organs or blood vessels. Tr. 874:20-22, 876:16-22. The bullet causing the third wound entered on the side of Burton's right index finger and exited through the top of that finger. Tr. 878:7-12. Dr. Lefferts related that the second and third wounds were not themselves fatal, and that no stippling or burn marks were found near either wound, indicating that they had not been inflicted at a close range. Tr. 878:25-879:13. Dr. Lefferts opined that it was possible that these three wounds were caused by two or three bullets. Tr. 886:17-21. Finally, based on the trajectory of these wounds, Dr. Lefferts opined that the gunshot wound to Burton's torso must have been inflicted with the muzzle of the gun pointing somewhat upwards, whereas the wound to the face and neck must have been inflicted by

---

[6]     This bullet was found inside Burton's shirt, behind the right shoulder. Tr. 871.

someone standing in front of Burton, holding the gun at Burton's left but pointing it to the right and somewhat downwards. Tr. 891:15-22.

The prosecution offered one final forensic expert, Dr. Rod Englert, an expert in the reconstruction of crime scenes and blood stain analysis, Tr. 1083. Dr. Englert opined that, based on the blood stains found on Burton's body, clothing, and at the scene of the crime, Burton was first shot in the torso area while leaning back defensively, and the same bullet then inflicted the wound to his finger, Tr. 1129:14-21. Based on the presence of blood on Burton's shoe and the smear in the pool of blood near his body, Dr. Englert was of the opinion that Burton stepped into his own blood as he fell to his knees after the first shot, and that he was then shot in the area just below the mouth, Tr.1129-31. Dr. Englert opined that Burton then fell face-forward on Ms. Palmer under the table, and that Ms. Palmer's statement that she had later turned him over explains why he was found on his back. Tr. 1130:11-17. Dr. Englert, like Dr. Lefferts, calculated that Burton's shooter was beyond the 12 to 18 inch range when the shot was fired. Tr. 1131:18-20.[7] Dr. Englert, also like Dr. Lefferts, concluded that the trajectory of the bullet that caused the face wound indicated that the gun had been pointing downward when the shot was fired. Tr. 1163-67.

---

[7]    The only witness offered by the defense, Mr. Paul Edwin Kish, a forensic consultant, testified that, in his opinion, although Englert's reconstruction of the crime scene was a plausible one, the forensic evidence was also consistent with different scenarios. Tr. 1249-54, 1292-1309, 1351-53. In particular, Kish was not able to conclude to a reasonable degree of scientific certainty the order in which the gunshot wounds had been inflicted, Tr. 1233-1242, nor could he conclude that the smear in the blood pool near Burton's body was caused by Burton stepping on it as he fell forward, as opposed to being smeared by his hand falling on it when Palmer turned his body over. Tr. 1300-03. As the Supreme Court noted in Jackson, however, "a federal habeas court faced with record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution." Jackson, 443 U.S. at 326. Thus, for purposes of this opinion, the court assumes that the jury believed Englert's reconstruction of the crime scene and not Kish's.

In addition to the evidence of the eye witnesses and the police forensic experts, the prosecution offered the testimony of two informants. The first, Devon Williams, testified that he became acquainted with petitioner through his Jamaican family members in 1981, when Williams was 5 years old. Tr. 684:21-686:23. From 1986 through 1995, Williams frequently saw petitioner when the later visited Los Angeles, where Williams resided. Tr. 687:24-688:5. When Williams saw petitioner in Los Angeles in December of 1995, Bonton told Williams that he was again in Los Angeles because "he shot somebody in New York so he gotta come to California." Tr. 711:17-20.

The second informant, Dwight Goodwin, testified that he became acquainted with petitioner through another Jamaican national, a Richard Givens, in December of 1995. Tr. 931:4-17. Goodwin testified that sometime in April of 1996 he and petitioner spent a weekend in Jacksonville, Florida on vacation. Tr. 935:10-20. At some point during the trip, when Goodwin and petitioner were discussing who they knew in Brooklyn, petitioner told Goodwin that he had shot someone on Ocean Avenue in Brooklyn. Tr. 935:24-936:23.

On direct appeal, petitioner argued that the state had not adduced sufficient evidence to establish beyond a reasonable doubt that (a) he had actually fired the shot that killed Burton,[8] and (b) he had the requisite intent to kill Burton. See Pet.'s Br. at 30. Viewing the evidence in the light most favorable to the prosecution, the court concludes that a rational trier of fact could have found that petitioner intentionally caused Burton's death during the commission of a burglary.

---

[8]     As petitioner's counsel pointed out to the Appellate Division, because the prosecution did not charge that petitioner commanded the shooter to kill Burton, the jury had to find that petitioner had actually fired the shot that killed Burton, as accomplice liability cannot be the basis for criminal culpability for first-degree felony murder under New York law. See Pet.'s Br. at 29-30.

With respect to the identity of Burton's killer, it is important to note that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) (citations omitted). In this case, although Nelson is the only witness who placed petitioner in the kitchen at the time of Burton's death, his testimony is corroborated by all of the forensic evidence presented to the jury. Specifically, the jury could have rationally concluded, based on Nelson's statement that the first shot fired came from behind him and was not fired by either Kanarki or the unidentified gunman, that petitioner fired the first shot. The jury could have further concluded that this first shot hit Burton's torso as opposed to his face because Cecil Bishop testified that immediately after the first gunshots he heard someone scream "ow, ow," and Dr. Lefferts testified that a gunshot of the kind inflicted on Brown's body or Burton's face and neck would have left them unable to scream out. Dr. Englert also confirmed that the shot that hit Burton's torso was fired before the shot that hit his face.

Having concluded the petitioner fired the first shot into Burton's torso, the jury could have rationally concluded that petitioner fired the second shot at Burton, which hit his face and entered his neck. This is so because the angle of the face wound indicated that the shot came from someone who stood above Burton, who had fallen to the ground as a result of the first shot, not from someone who stood some distance away from Burton, as did the second gunman according to Nelson's testimony. As respondent points out, New York courts have consistently held that even when no eyewitness sees who shot the victim, circumstantial evidence establishing the identity of the killer is legally sufficient evidence. For example, in People v. Ruiz, 211 A.D.2d 829, 830 (1995), two eyewitnesses testified that they heard gunshots being fired on the street and then saw the defendant holding a gun and jogging away from the location where the victim was found. The Appellate

12

Division held that the evidence was legally sufficient to establish the identity of the killer, reasoning that "[w]hen a conviction is based solely upon circumstantial evidence, [the court] must determine whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by [the jury]." Id. See also People v. Martinez, 197 A.D.2d 539, 540 (1994) (testimony of eyewitness who, after seeing defendant point a gun at victim's head, ran away but heard two shots being fired, sufficient to support conviction of murder in the second degree). Thus, the evidence in this case was legally sufficient to establish that petitioner fired the shot that caused Burton's death. In other words, on the issue of the identity of Burton's killer, "this is a situation in which a jury could have found, and apparently did find, that the combination of many small pieces of valid evidence . . . was adequate . . to establish the element[] of . . . the crime beyond a reasonable doubt." Einaugler, 109 F.3d at 840 (citations omitted).

All of petitioner's appellate counsel's arguments to the contrary are meritless. First, petitioner's reliance on state law cases such as People v. Wong, 81 N.Y.2d 600 (App. Div. 1993), in arguing that there was insufficient evidence to establish the identity of Burton's killer, see Pet.'s Br. at 31, is unavailing. In Wong, two defendants were convicted of the manslaughter of a child who had died of "shaken child syndrome." Id. at 605-06. Although only one of them could have caused the death of the child by shaking it, the prosecution sought to convinct both defendants on a "passive observer theory," namely, the theory that one defendant had recklessly stood by while the other caused the child's death, id. at 607. The New York Court of Appeals reversed the convictions on the ground that there was not enough evidence to establish that one defendant had actually seen or stood by while the other shook the child, and thus the entire prosecution theory fell. Id. at 610. Quite plainly, this is not a case in which petitioner's guilt of the murder of Burton depended on his

13

or any other participant's being a passive observer; the reasoning of Wong is thus inapplicable to this case. Similarly unavailing is reliance on cases like People v. Hawkins, 290 A.D.2d 812 (2002), People v. Alvarado, 262 A.D.2d 710 (1999), and People v. Carrasquillo, 136 A.D.2d 297 (1988). Those cases simply stand for the proposition that "[w]here an injury results from blows inflicted by two different actors, the prosecution must produce legally sufficient evidence that the defendant's actions were a sufficiently direct cause of the victim's physical injury." Hawkins, 290 A.D.2d at 813. Here, there is no question that the shot that killed Burton was caused by one and only one person because it was established that the torso and finger wounds were not fatal. Thus, the only issue for the jury was whether the evidence established that petitioner, as opposed to the second gunman, fired that shot, an issue on which the prosecution offered ample circumstantial forensic evidence.

To the extent that petitioner argues that the court should discount Nelson's testimony as not credible, see Pet.'s Br. at 10, 31, 32, a federal court is not empowered to make a credibility assessment in a habeas proceeding. See Bossett, 41 F.3d at 830. See also Fauntleroy v. Artuz, No. 00-CV-2209 (JG), 2003 WL 22670996, at *2 (E.D.N.Y. Oct. 31, 2003) (in reviewing sufficiency of the evidence, the court must not "disturb the jury's findings with respect to [a] witnesses' credibility . . . [or] make credibility judgments about the testimony presented . . . [or] weigh conflicting evidence."). Similarly, although petitioner offers several alternative theories to explain the forensic evidence in this case, each with different degrees of plausibility, it is not the court's role to decide whether petitioner's interpretation of the forensic evidence is more appropriate than the jury's. See, e.g. Pet.'s Br. at 30 (arguing that there is no proof that the first shot actually hit Burton despite Bishop's testimony that the first shot was followed by someone screaming "ow, ow"), 31 (arguing

14

that the second shooter could have fired all the bullets that hit Burton despite evidence that the gunman was standing above Burton when fatal shot was fired).

As to the second disputed element, intent to kill, there was also more than sufficient evidence to establish that petitioner intended to kill Burton. In New York, courts have consistently held that intent to kill is established when a defendant fires more than one shot at a victim at a close range. See, e.g., People v. Bell, 44 A.D.3d 1065 (2007) (argument that "evidence that [defendant] shot the victim twice at close range was legally insufficient to establish his intent to kill is without merit."); People v. Kwak, 29 A.D.3d 385 (2006) (finding that there was "extensive evidence of . . . intent to kill the deceased [where] forensic and medical evidence support[ed] the inference that defendant had fired a shot downward at the fallen victim."). As noted earlier, the prosecution established that the first shot hit Burton's torso; thus, petitioner's intent to kill was established by evidence that he shot Burton a second time while Burton was on the ground. Petitioner's counsel's argument that the evidence supports the conclusion that the first shot was fired accidentally, see Pet.'s Br. at 35, is irrelevant even if accurate because the subsequent shot establishes unequivocal intent to kill.

## II.    The Prosecutor's Comments During Voir Dire

Petitioner next argues that certain prosecutorial comments during voir dire denied him a fair trial in violation of his due process rights under the Fourteenth Amendment. See Pet. at 7-8. In particular, petitioner's appellate counsel argued that the prosecutor impermissibly invited the jury to find petitioner guilty of murder in the first degree by suggesting that he would otherwise be eligible for parole. See Pet.'s Br. at 41-46.

15

During the extensive voir dire in this case, the prosecutor told several members of the venire, three of whom actually served on petitioner's jury, Kathy Rouse, Edgerton Maloney, and Carol Baerga, that murder in the first degree is the only crime under New York law punishable by either the death penalty or life without parole. See V.D. at 2960-62 (Rouse); 6372-73 (Maloney); 11,961 (Baerga).[9] He also told Mr. Maloney that if the jury convicted the defendant of murder in the second degree, "sentencing [would be left] . . . to the judge." V.D. at 6573:5-7. In addition, he explained to another future juror, Gemma Grigsby, that certain crimes, such as the intentional killing of a child not in the course of a felony, were not murder in the first degree, although he did not discuss questions of punishment with Ms. Grigsby. V.D. at 6384-86. These brief explanatory remarks, which occurred in the context of a several minute interview of each potential juror, were intended to explain certain legal concepts to determine whether a particular candidate could properly serve as a juror in a capital case, see V.D. 2952-94, 6378-6405, 6558-6600, 11958-93. The comments were limited to these four jurors and occurred from seven weeks to four and a half months before the jurors began their guilt phase deliberations. See Tr. at 1696 (jury deliberations began on March 29, 2000). In charging the jury, the trial judge explicitly instructed all the jurors that "[i]n arriving at your verdict, you should disregard entirely any question of punishment" and that "punishment should be removed from your mind absolutely and completely." Tr. at 1621:6-12.

Relying primarily on Beck v. Alabama, 447 U.S. 625 (1980) and Simmons v. South Carolina, 512 U.S. 154 (1994), petitioner's appellate counsel argued that "when the jurors' assessment of the defendant's guilt or innocence of capital murder is animated by a concern that, unless they convict

---

[9]     Citations to "V.D." refer to the Voir Dire transcript, submitted as Exhibit B to respondent's motion in opposition to this petition. Dkt. No. 4.

the defendant of first-degree murder, [petitioner] may well be paroled[,] . . . the verdict is . . . violative of due process." Pet.'s Br. at 41-42. For the reasons set forth below, the court finds that the prosecutor's comments did not violate the Constitution and, in any event, were harmless.

In Beck v. Alabama, the Supreme Court struck down a state law that required the automatic imposition of the death penalty upon a jury's conviction of capital murder but prohibited the trial judge from instructing the jury on a lesser included non-capital offense. See Beck, 447 U.S. at 628-29. Under the statute, a conviction on the murder charge mandated a punishment of death, and an acquittal on that charge meant that the defendant would go free. See id. The Supreme Court reasoned that the statute violated due process because the failure to give the jury the option of convicting a defendant of a lesser offense "enhance[d] the risk of an unwarranted conviction," id. at 637, and, in fact, "created [distortion] when the jury is forced into an all-or-nothing choice between capital murder and innocence." Spaziano v. Florida, 468 U.S. 447, 455 (1984) (citing Beck, 447 U.S. at 638-43).

Beck is distinguishable from this case because it concerned the judge's instructions to the entire jury before deliberations which, although pertaining to the issue of guilt, also determined punishment.[10] This case, by contrast, involves the prosecutor's off-hand remarks to a limited number of jurors weeks to months before their deliberations in the guilt phase, when not only was punishment not at issue, but the trial judge explicitly instructed the jury to disregard any issue of punishment. See Tr. at 1621:6-12. In addition, the reasoning of Beck is inapplicable because the judge's charge in this case did include the lesser offenses; thus the charge did not inform the jury that

---

[10]    In Beck, because the jury's conviction of capital murder required imposition of the death penalty and acquittal required releasing the defendant, the guilt and punishment phases were effectively merged.

if it acquitted the defendant of capital murder, the defendant "must be discharged." Beck, 447 U.S. at 630. For this reason, there is no risk that the prosecutor's limited remarks either forced the jury into an all-or-nothing choice between conviction and acquittal, or that they created the impression, as did the charge in Beck, that should the jury acquit petitioner of first degree murder, he would "escape all penalties for his . . . crime." Id. at 629.

In Simmons v. South Carolina, the Supreme Court reversed a death sentence because the defendant's future dangerousness was mentioned as an aggravating factor by the prosecutor during the penalty phase of the trial, but the judge refused to instruct the jury that defendant would never be eligible for parole even if he was not sentenced to death - creating a "misperception" of the law. See Simmons, 512 U.S. at 156; see also Kelly v. South Carolina, 534 U.S. 246 (2002) (reaffirming and applying the holding in Simmons). Simmons is inapposite to this case because it dealt with a judge's incomplete charge to the jury during the penalty phase, and not, as in this case, with the prosecutor's comments to a few jurors weeks to months before the beginning of the guilt phase of the trial.

Petitioner nevertheless attempts to analogize the reasoning of Simmons to his case. The Court in Simmons noted that because that case involved the judge's refusal to inform the jury that even if the death penalty were not imposed, defendant would never be eligible for parole, the jury "may have believed that petitioner could be released on parole if he were not executed, [a] misunderstanding [that may have] creat[ed] a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Id. at 161-62. Thus, petitioner argues, because the jury knew that first degree murder is the only crime for which life imprisonment without the possibility of parole could be imposed, the prosecutor "invited the jury to find [petitioner] guilty of

first-degree murder, because it was the only sure way of keeping [him] off the streets." Pet.'s Br. at 44. Although this analogy has superficial appeal, it is deficient in two key respects. First, there is no question here but that the prosecutor's comments to the jury on the law were accurate and complete;[11] thus, the jury was presented with no "false choice," nor did it suffer from a "grievous misperception," as did the Simmons jury. Second, in Simmons, the jury's "grievous misperception was encouraged . . . by the state's repeated suggestion that petitioner would pose a future danger to society if he were not executed." Id. at 162. See also Kelly, 534 U.S. at 255 (where prosecutor makes an issue of defendant's future dangerousness in prison if not sentenced to death, judge must inform jury that he is ineligible for parole under state law). In this case, by contrast, there is no argument that the prosecutor ever suggested that petitioner would pose a future danger to society if he were not convicted of first degree murder.

Thus, because this case does not involve a misleading or incorrect jury instruction, nor does it involve a prosecutor's unwarranted emphasis on petitioner's future dangerousness, the Supreme Court's concerns in Simmons are inapplicable.

In any event, any error by the trial court in allowing the prosecutor to make these statements was harmless under the standard set forth in Kotteakos v.United States, 328 U.S. 750, 776 (1946). See also Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (holding that Kotteakos standard for harmless error review applies). Under Kotteakos, the question is whether the prosecutor's comments

---

[11]    Petitioner's appellate counsel argued that the prosecutors disclosure of the capital sentencing scheme was "incomplete and . . . misleading," see Pet.'s Br. at 43-44, yet failed to explain in what way the information was incomplete. Nor could he explain why the information was misleading, because first degree murder *is* the only crime under New York law for which the death penalty or life imprisonment without parole were the only possible punishments at the time of petitioner's trial, see N.Y. Penal Law §§ 60.05, 60.06, 70.00.

on the punishment that attaches to first-degree murder in New York "had [a] substantial and injurious effect or influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776. Under Second Circuit case law, the court "considers the erroneous admission or exclusion of evidence to be harmless 'if there is fair assurance that the jury's judgment was not substantially swayed by the error.'" United States v. Estrada, 430 F.3d 606, 622 (2005) (citing United States v. Yousef, 327 F.3d 56, 121 (2d Cir.2003) (internal citations omitted)). Petitioner has not met this standard.

Although petitioner makes much of the fact that the prosecutor noted that if petitioner were convicted of any crime other than first degree murder, punishment would be out of the jury's hands, see Pet.'s Br. at 43, this comment was made to a single juror, see V.D. at 6573:5-7 (Maloney), and thus cannot be considered substantial or injurious. Petitioner also argues that the prosecutor's statements, "invited jurors to speculate about the sentencing options available," Pet.'s Br. at 43, but it is difficult to discern how this comment could have substantially affected the jury's verdict given that, as noted, it was made seven weeks to four months before deliberations began, immediately prior to which the trial court explicitly instructed the jury to completely disregard punishment. See Tr. at 1621:6-12; see also Brown v. Crosby, 249 F.Supp.2d 1285, 1320 (S.D. Fla. 2003) (holding that trial judge's inaccurate comments during voir dire regarding defendant's eligibility for parole were harmless because he instructed the jury to not consider punishment during their guilt deliberations). In addition, the evidence of petitioner's guilt was overwhelming. As discussed previously, there was strong evidence establishing that petitioner killed Burton, including powerful forensic evidence, Nelson's in-court identification, petitioner's fingerprint at the scene of the crime, and the testimony of the two informants to whom petitioner confessed his guilt. The court is therefore convinced that the trial court's admission of the accurate, brief comments during voir dire, occurring months before

20

deliberations began, did not deny petitioner a fair trial or "substantially sway[]" the jury's judgment. See Estrada, 430 F.3d at 622.[12]

## III. The Cross-Examination of Dwight Goodwin and the Interested Witness Charge

As noted previously, the prosecution offered the informant testimony of Dwight Goodwin, an acquaintance of petitioner, who testified that petitioner admitted that he had shot someone on Ocean Avenue, Brooklyn. Petitioner raises several issues regarding the trial court's rulings on defense motions relating to Dwight Goodwin; each is addressed in turn below.

### A. Cross-Examination Regarding Goodwin's Motives to Lie

Goodwin was arrested in Florida on April 16, 1996 on several federal drug felony charges. He immediately began to cooperate with federal authorities and entered into an agreement whereby he would receive a sentence of 188 months on the federal charges in exchange for cooperation "whenever called upon" by the government. See Tr. at 972-73. Goodwin was ultimately sentenced to a reduced sentence of 100 months in prison on the strength of a federal prosecutor's recommendation for a sentence reduction, as contemplated by the agreement. Tr. 941, 946-47, 979-81. Pursuant to the agreement, Goodwin was required to continue cooperating with the government in ongoing criminal investigations, Tr. 907, 944-45, and he understood that should the federal prosecutor make a recommendation under Fed. R. Crim. Proc. 35(b), he could potentially receive

---

[12]     The remainder of petitioner's arguments with respect to the voir dire comments merit little discussion. For example, petitioner cites law review articles and empirical studies to support his argument, see Pet.'s Br. at 44-45. Those publications analyze certain factors - such as the jury's understanding of the possible range of punishments it can impose - that impermissibly sway or coerce a jury into imposing a death sentence. The studies are inapposite, however, because they do not speak about the effect, if any, that those factors may have on the jury's determination of guilt, the determination at issue in this case.

a further sentence reduction. Tr. 946. Goodwin testified that he "hoped" that his sentence would be reduced even further based on his continuing cooperation. Tr. 984. All of this information was disclosed to the jury, and defense counsel cross-examined Goodwin at length regarding his cooperation with the government and his reasons for testifying against petitioner. See Tr. at 974-84, 987-90. When defense counsel then inquired whether Goodwin had "discussed possible Rule 35(b) motions with [his lawyer]," Tr. 984:15-16, the trial court precluded the inquiry as violative of Goodwin's attorney-client privilege. Tr. 985. Petitioner now argues that the court's preclusion ruling violated petitioner's confrontation rights under the Sixth Amendment to the United States Constitution. The claim merits little discussion.

It is established that the Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine the witnesses against him, because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). Importantly, "a[n] . . . attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues . . . in the case at hand." Id. The right is not unlimited, however, and it does not include the right to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Kentucky v. Stincer, 482 U.S. 730, 739 (1987) (citations omitted). Thus, "[a] defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witnesses and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable." Mills v. Singletary, 161 F.3d 1273, 1288 (11th Cir. 1998) (citations omitted).

22

In this case, petitioner's lawyer thoroughly questioned Goodwin regarding his extensive criminal history, which included robberies, drug dealing, and weapons offenses. See Tr. at 964-74. As noted, petitioner's lawyer also engaged in lengthy examination of Goodwin about his cooperation with the government, including the benefits Goodwin had received from that cooperation and his hope for a future sentence reduction based on his continued cooperation with the government. In summation, defense counsel argued that Goodwin's testimony should not be believed because his cooperation agreement gave him a motive to lie. Tr. 1514-15. Under these circumstances, where the court allowed defense counsel to "expose[] the jury to facts sufficient to evaluate [Goodwin's] credibility," Mills, 161 F.3d at 1288, petitioner's right to confront Goodwin was not violated. Goodwin's conversations with his lawyer were not only protected by the attorney-client privilege, but, more importantly, they would have caused "confusion of the issues" as they would have provided only "repetitive or . . . marginally relevant" information to the jury. Delaware v. Van Ardsall, 475 U.S. 673, 679 (1986). See also Mills, 161 F.3d at 1288 (holding that the trial court did not err in precluding cross-examination of cooperating witness regarding that witness' prior inconsistent statements to his lawyer as such testimony was protected by the attorney-client privilege and cross-examination had already revealed the witness's change in story, as well as his motivations to lie because of his cooperation agreement); Murdoch v. Castro, 489 F.3d 1063, 1068-79 (9th Cir. 2007) (holding that the trial court did not err in precluding cross-examination of cooperating witness regarding a letter he wrote to his attorney, alleging that he had been coerced into testifying against the defendant, because cross-examination had amply revealed the witness's inconsistent statements, criminal history, and supposed motives to lie based on his cooperation with the government).

## C. The Trial Court's Refusal to Give an Interested Witness Charge

At the end of the trial, the defense requested an interested witness charge with respect to Dwight Goodwin. See Tr. at 1426. In essence, the charge asked the jury to "examine[] and weigh[]" Goodwin's testimony "with greater care than the testimony of an ordinary witness . . . in light of the possibility that his testimony was influenced by the receipt of or expectation of benefit." See Pet.'s Br. at 25-26. The trial court refused the requested charge, see Tr. at 1426, but allowed defense counsel latitude to argue in summation that Goodwin was not credible because his testimony was colored by his belief that he would receive a benefit, arguments that defense counsel advanced. See Tr. at 1514-17. The trial court instructed the jury that in weighing the value and credibility of each witness's testimony, it should consider a witness's "interest or lack of interest . . . in the outcome of the case," Tr. at 1618:4-14, as well as a witness's prior convictions and criminal history, Tr. at 1622-23. The court did not, however, make any specific mention of Goodwin. Petitioner now argues that these rulings exacerbated the trial court's error in prohibiting defense counsel from cross-examining Goodwin regarding his conversations with his attorney. See Pet.'s Br. at 54-57.

As a threshold matter, the court notes that petitioner's "burden is especially heavy" in this context because he challenges the trial court's failure to give a specific instruction, as opposed to an erroneous instruction. See Henderson v. Kibbe, 431 U.S. 145, 155 (1974). Moreover, like evidentiary rulings, "[a] jury charge in a state trial is normally a matter of state law and is not reviewable on federal habeas corpus absent a showing that the alleged errors were so serious as to deprive defendant of a federal constitutional right." United States ex rel. Smith v. Montanye, 505 F.2d 1355, 1359 (2d Cir. 1974). In making this determination, "the habeas court must consider the whole jury charge in the context of all the charges given and the events at trial." McCaskell v.

Keane, No. 97-CV-2999 (RPP), 2001 WL 840331, at *10 (S.D.N.Y. Jul. 26, 2001) (citing Vargas v. Keane, 86 F.3d 1273, 1277 (2d Cir. 1996)). Petitioner has failed to meet this heavy burden.

Several courts in this circuit have concluded that the failure to give a specific interested witness charge does not violate due process. For example, in McCaskell v. Keane, the trial court refused to give an interested witness charge with respect to a government informant, and instead gave a general charge that instructed the jury to assess a witness's credibility based in part on the witness's potential motivations to lie. The district court held that this did not violate due process because the credibility instruction "permitted the defense to effectively present its argument as to the value of the informant's testimony by allowing the jury to consider the motives of the . . . informant and any benefits he might receive as a result of a cooperation agreement," and because the "defense counsel cross-examined the [witness] at length and argued during summation that the [witness] was 'totally unworthy of belief,' in part, because of the cooperation agreement." See id. (internal citations omitted). Similarly, as detailed above, the trial judge in this case gave a specific instructions to the jury regarding witness credibility, and allowed the defense counsel broad latitude to question Goodwin regarding his past criminal history and his cooperation agreement, as well as to argue that his past crimes and cooperation agreement made Goodwin an untrustworthy witness. Thus, petitioner has failed to show that the failure to give the instruction was constitutional error. See also Kettreis v. Connell, No. 06-CV-5032 (BMC), 2007 WL 2963678, at *1 (E.D.N.Y. Sept. 12, 2007) (holding that failure to give a specific interested witness charge did not violate due process because the judge properly instructed the jury concerning how to assess bias and credibility of a witness, and because the witness's cooperation agreement and motivation to lie was "the subject of both argument and evidence throughout the trial."); Tung v. Fischer, No. 01-CV-3877 (JG), 2003

26

### B. Motion to Re-Open Goodwin's Cross-Examination

Next, petitioner challenges the state court's denial of his motion to re-open the cross-examination of Goodwin. On March 28, 2000, several days after the completion of Goodwin's cross-examination, a federal magistrate judge in Florida granted defense counsel's motion to unseal portions of Goodwin's pre-sentence report. See Tr. at 1382. According to defense counsel, the unsealed portions stated that "during the period of time . . . when [petitioner] had allegedly told Goodwin that he had shot someone on Ocean Avenue, Goodwin abused drugs [and alcohol] extensively . . .." Pet.'s Br. at 22, Tr. at 1382. The defense moved, inter alia, to re-open Goodwin's cross-examination so it could impeach him on the basis of this assertedly new information. The prosecutor opposed the motion, arguing that, since the beginning of petitioner's trial, defense counsel possessed the transcript of Goodwin's testimony in a Florida deposition, in which Goodwin acknowledged extensive alcohol abuse since 1989, as well as smoking marijuana from 1990 to 1996. See Tr. at 1385-86. Defense counsel did not deny possessing this testimony, but argued that he would have asked Goodwin about his substance abuse problem had he known of its extent. See Tr. at 1392-93. The court denied the motion, ruling that the defense "had enough to go and engage him on the marijuana use" but had made a tactical decision not to do so. Tr. at 1398. Petitioner now argues that this ruling violated his confrontation rights. Because the Confrontation Clause "does not require the court to reopen cross-examination so that defense counsel can pursue a line of questioning that was available when the witness testified initially," Stephens v. Hall, 294 F.3d 210, 227 (1st Cir. 2002), however, no violation occurred here; as noted it is undisputed that when defense counsel cross-examined Goodwin, he was aware that Goodwin had been a substance abuser since 1989, years before his conversation with petitioner to which he testified at trial.

24

WL 22999662, at *15-16 (E.D.N.Y. Dec. 22, 2003) (holding that trial court's refusal to give interested witness charge was not constitutional error, in part because the court had given a proper and lengthy instruction on how to properly assess the credibility and bias of witnesses).

## IV.    The Admission of Evidence of Uncharged Crimes

Petitioner's next argues that he was denied due process by the trial court's admission of certain evidence of uncharged crimes. See Pet. at 11. In particular, petitioner's appellate counsel challenged the following five statements made or elicited by the prosecutor during the course of the trial. See generally Pet.'s Br. at 60-67.

(1) During his opening statement, the prosecutor told the jury that a latent fingerprint found in Burton's apartment had been identified through fingerprint analysis as that of a Kenny Renford Smith as well as a Garfield Bryan, names that the police concluded were petitioner's aliases. See Tr. at 48. No mention of any criminal activity was made in connection with these remarks. Before the actual testimony of Detective Goellner, who performed the fingerprint analysis that matched the crime scene fingerprint to the prints taken from petitioner, however, the court precluded the prosecutor from referring to a fingerprint card bearing the name Kenny Renford Smith, see Tr. at 531:7-18. Goellner thus testified that he had matched the latent print in Burton's apartment to known prints taken from petitioner when he was arrested under the alias Garfield Bryan, but there was no testimony concerning Kenny Renford Smith. Tr. at 555-56. Immediately after Goellner's testimony, as well as during the jury charge, the court instructed the jurors that they could not consider the existence of fingerprint cards as evidence of defendant's criminal propensity. See Tr. 564:6-20, 1614-15.

27

(2) Dwight Goodwin testified that an acquaintance, Richard Givens, had introduced Goodwin to petitioner by saying: "[petitioner] was one of us, you know, he did the same thing as us." Tr. at 932:10-11. At that initial point in his testimony, Goodwin had not yet told the jury what he did for a living, although later in his testimony, Goodwin admitted that he had been involved in a conspiracy to distribute cocaine and in other criminal activity. The prosecutor did not ask Goodwin to explain the meaning of "he did the same thing as us." See, e.g., Tr. at 937-38. Petitioner contends that this statement implied that he is a criminal like Goodwin.

(3) Goodwin also testified that he and petitioner took a trip to Jacksonville, Florida in April of 1996, and that the defendant was "with [him] pretty much for the [entire trip]." Tr. at 935:21-22. Goodwin stated that "[a]fter [he] returned . . . from Jacksonville," he was arrested by the FBI along with Richard Givens, one Fabian Morrison, and a "fourth person" on cocaine distribution charges. Tr. at 936:24-937:11. No mention of defendant was made in connection with this arrest, nor is there any indication that Givens or Morrison were part of the Jacksonville trip, or that the arrest occurred immediately after the trip. Petitioner nevertheless argues that "it was obvious that [Goodwin] was referring to [petitioner]," thus implicating him in the cocaine distribution charges and showing his propensity to commit crime. See Pet.'s Br. at 63.

(4) Goodwin later testified that he wanted to avoid deportation to Jamaica out of fear of retribution for his testimony against certain unnamed individuals, see Tr. at 955:8-12, and defense counsel elicited during cross-examination that this desire to avoid deportation may have motivated Goodwin to cooperate with the government by testifying falsely against defendant. Tr. at 964. No specific mention of defendant was made during this exchange, nor did Goodwin indicate that he had been subjected to specific threats or other criminal activity. Nonetheless, petitioner argues that this

testimony invited the jury to "speculate that [petitioner] threatened the witness, reflecting a consciousness of guilt." Pet.'s Br. at 64.

(5) Devon Williams testified that defendant had asked him "if [Williams] got anybody who [defendant] can rob or something like that." Tr. at 695:7-8. Surprised by the answer, the prosecutor immediately offered to withdraw the question and moved to strike the answer, id. at 695:11-14; the trial judge did not actually hear the answer, id. at 696:6-8. In any event, the answer was stricken from the record and the court instructed the jury to disregard the question and answer. Tr. at 710:24-711:2. Petitioner argues that the stricken statement "compelled the jurors to draw the inference that appellant had a propensity to commit robberies." Pet.'s Br. at 65.

As a threshold matter, it is settled that "federal habeas corpus relief does not lie for errors of state law," and that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Thus, admission of evidence in violation of state law is not a violation of federal due process unless it "is so extremely unfair that its admission violates fundamental conceptions of justice." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (citing Dowling v. United States, 493 U.S. 342, 352 (1990)). Importantly, the evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it," and the materiality of the evidence must be assessed in light of the entire record. See id.

None of the above-mentioned statements was sufficiently material to provide the basis for a conviction. First, none constitutes direct testimony of petitioner's actual involvement in uncharged crimes or any criminal activity. Rather, as petitioner's appellate counsel candidly admitted in the

29

appellate brief, the contention is that they merely *implied* that petitioner was involved in criminal conduct. See, e.g., Pet.'s Br. at 61 (arguing that it is prejudicial to convey evidence of uncharged crimes through "insinuation, speculation, or suggestion."). "Implications, however, do not generally amount to evidence and therefore the . . . testimony was insufficient to constitute a ground for habeas relief." Roldan v. Artuz, 78 F.Supp.2d 260, 280 (S.D.N.Y. 2000) (holding that implication that defendant committed a robbery was not inadmissible evidence of uncharged crimes and collecting cases). In any event, petitioner asks the court to draw inferences that are too improbable to accept. For example, Goodwin's statement that he was afraid to return to Jamaica because he feared people against whom he had testified revealed only Goodwin's subjective fear of potential retribution; he did not even mention that he had received any specific threat, much less did he suggest any wrongdoing on petitioner's part. Similarly, Goodwin's statement that he was arrested "with a fourth person," cannot be read to imply that petitioner was the person arrested with Goodwin, absent jury speculation that Goodwin's arrest occurred immediately as he was returning from Jacksonville still accompanied by petitioner, a fact not in any way implied by Goodwin's testimony. The claim that the jury understood the mention of petitioner's aliases, the existence of fingerprint cards, or Goodwin's statement that petitioner was introduced as "one of [them]," as evidence of prior criminal conduct or propensity to commit crime is also founded on mere speculation. The only testimony that could possibly raise any suggestion that petitioner was involved in uncharged criminal conduct was Williams's statement that petitioner asked him about drug dealers to rob. But the only inference that might be drawn from that statement is that petitioner had the *intent* to participate in some future, undetermined criminal activity, not that petitioner had actually done so. In any event, the brief question and answer were stricken from the record with appropriate instructions. In sum, because

30

the challenged statements raise only implausible or speculative inferences regarding unspecified criminal activity, they do not, either singly or in combinations, rise to the level of materiality that warrants habeas relief.

Moreover, most of the challenged statements were elicited for appropriate independent purposes, and not to show petitioner's propensity to commit crimes. Goodwin's statement that petitioner was introduced to him as being "one of [them]" established that petitioner trusted Goodwin and thus explained why petitioner would confess to Goodwin that he had shot someone in New York; in other words, it tended to "explain the unique relationship between [petitioner] and the witness." DeVino v. Duncan, No. 01-CV-9044 (DLC), 2004 U.S. Dist. LEXIS 7110, at *12 (S.D.N.Y. Apr. 22, 2004) (holding that admission of testimony relating to the criminal activity that connected the defendant and the witness to whom the defendant confessed was not a constitutional violation). Moreover, Goodwin's testimony that he was arrested and convicted of federal charges in April 1996 with Givens, Morrison, and a "fourth person," like his testimony regarding his reasons to fear returning to Jamaica, were permissible attempts by the prosecution to disclose to the jury on direct examination reasons why Goodwin might be untrustworthy. See, e.g., Tr. at 972-92.

The only challenged statement with no discernable purpose was Williams's testimony that defendant had asked him if he knew of anyone defendant could rob. However, the prosecutor immediately interposed that he had not intended to elicit that answer, offering to strike that testimony, see Tr. at 695, and thus weakening any argument that the stricken statement violated petitioner's constitutional rights. See, e.g., Scrivner v. Tansy, 68 F.3d 1234, 1240 (10th Cir. 1995) (holding that witness's statements that defendant was involved in other, uncharged crimes were not constitutional error, in part because they were unsolicited). In any event, it cannot be said that this

31

isolated remark that the court immediately struck from the record was so material as to convince the jury that petitioner was guilty of the double homicide with which he was charged, or that it eliminated any reasonable doubt the jury may have had given that, by the end of the trial, the evidence of petitioner's guilt was overwhelming. See supra at p. 12-15.

Finally, to the extent that any prejudice may have resulted from these statements it was sufficiently cured by the trial judge's instructions to the jury, which this court "must presume the jury followed . . .." Herring v. Meachum, 11 F.3d 374, 378 (2d Cir. 1993) (citing Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)).[13] First, the court instructed the jurors to reach a determination "solely on the facts presented in th[e] case," and that they "should not speculate on the possible existence or non-existence of facts which were not presented here at trial." "In other words," the trial court continued, the jury must "leave speculation out of . . . deliberations entirely." Tr. 1612:22-1613:5. This instruction undermines petitioner's contention that the jury drew negative inferences about petitioner from the isolated statements challenged in this case. Second, the court admonished the jurors that they were not permitted to use petitioner's association with Goodwin and Williams, or Goodwin's and Williams' prior bad acts, as evidence of petitioner's guilt. See Tr. at 1623:7-18. This instruction cures any prejudice that may have resulted from Goodwin's statement that petitioner was introduced as "one of us" as well as his statements regarding the arrest following the Jacksonville trip. Third, as noted, the court instructed the jury to completely disregard stricken

---

[13] Although this presumption does not apply if "there is an overwhelming possibility that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant," Herring, 11 F.3d at 378 (citations omitted), the statements at issue here do not meet these criteria. See, e.g., DeVino, 2004 U.S. Dist. LEXIS 7110, at *12 (applying presumption that jury followed the judge's instructions not to use statements of defendant's connection to drug activities as propensity evidence).

testimony, see Tr. at 1612, as it had done immediately after Williams's statement that petitioner had asked him whether he knew someone to rob, see Tr. at 710:24-711:2. Finally, the court explicitly instructed the jury that evidence of the existence of fingerprint cards taken by the police "may not be considered . . . as proof that [petitioner] possesses a propensity or disposition to commit the crimes charged or any other crime. It was not offered for that purpose, and must not be considered by you for that purpose." Tr. 1615:2-9. This instruction cures any potential prejudice by the oblique references in Detective Goellner's testimony and the prosecutor's opening statement to the existence of fingerprint cards in petitioner's file.

In sum, the court holds that none of the challenged statements was sufficiently material to remove whatever reasonable doubt the jury may have had regarding petitioner's guilt. Thus, habeas relief is not warranted on this ground.

## V.     The Annotation of the Verdict Sheet

Finally, petitioner argues that the trial judge's annotation of the verdict sheet denied him due process of law. See Pet. at 11.

On March 29, 2000, the trial court submitted a proposed verdict sheet to the parties. In it, count three was listed as "Murder in the First Degree - Intentional Felony Murder of Harold Burton during the course of a Burglary," and count eight was listed as "Murder in the Second Degree - Felony Murder of Worrell Brown during course of Burglary." Tr. 1473, Pet's. Br. at 25. Defense counsel objected to the "during the course of" language in count three and asked that the court add the language "in the furtherance of," to comport with the full statutory definition of murder in the first degree under New York Law. Tr. 1473:4-10. See N.Y. Penal Law § 125.27[vii] (felony murder

in the first degree defined, <u>inter alia</u>, as "intentional killing in the course of committing . . . or in furtherance of [a designated felony]"). The trial court overruled the objection, noting that the jury charge would explain each of the elements of the crime as defined by the statute. Tr. 1473:11. It is undisputed that under N.Y. Crim. Proc. Law §310.20, as it was in effect at the time of petitioner's trial, when a verdict sheet contains "two or more counts charging a violation of the same section of a law . . ., the court may set forth the dates, names of complainants or specific statutory language, without defining terms, by which the counts may be distinguished; provided, however, that the court shall instruct the jury in its charge that the sole purpose of the notations is to distinguish between the counts charging a violation of the same section of the law." N.Y.C.P.L § 310.20(2). It is also undisputed that the trial judge's charge to the jury on each element of the charged crimes was complete and accurate, and that he told the jury that the verdict sheet was prepared "to assist in . . . their deliberations." Tr. at 1693:9-10.

On direct appeal, petitioner argued that the verdict sheet and jury instructions violated § 310.20(2) because (1) the sheet did not use the exact statutory language and (2) the judge failed to instruct the jury that the sole purpose of the notations was to distinguish between similar counts, as required by law. <u>See</u> Pet.'s Br. at 69-70. Respondent does not dispute point (2), that the judge violated § 310.20(2) when he failed to instruct the jury about the purpose of the notations, <u>see</u> Resp.'s Mem. at 74, but argues that the "in the course of" language does not violate § 310.20(2), and that both errors were harmless. The court need not resolve the question of whether the incomplete language violated § 310.20(2), however, because, even assuming <u>arguendo</u> that the annotated verdict sheet violated New York law, petitioner has not demonstrated that the violation ran afoul the U.S. Constitution.

34

Once again, the court notes that state law errors do not necessarily rise to the level of federal constitutional violations warranting habeas relief. See Dunnigan v. Keane, 137 F.3d at 125. In fact, at least one court in this circuit has noted that "a violation of C.P.L. § 310.20(2) does not in and of itself violate the United States Constitution," Anderson v. Keane, 283 F.Supp.2d 936, 942 (S.D.N.Y. 2003), because "in cases involving multiple counts, [the use of annotated verdict forms] has been commended [by federal courts] for promoting informed consideration by the jury." Melendez v. Scully, No. 91-cv-2947 (RR), 1993 WL 41769, at *6 (E.D.N.Y. Feb. 10, 1993) (quoting United States v. Bozza, 365 F.2d 206, 225 (2d Cir. 1966)). Thus, habeas relief will not be granted on the basis of an annotated verdict sheet that violates New York state law unless it "so infected the entire trial that the resulting conviction violates due process." See id. at *6 (quoting Blazic v. Henderson, 900 F.2d 534, 541 (2d Cir. 1990)); see also Belgrave v. Greiner, No. 97-cv-4179 (RR), 1999 WL 1007350, at *5 (E.D.N.Y. Aug. 31, 1999)).

In Miller v. Greene, No. 05-CV-3131 (JG), 2005 WL 2757218 (E.D.N.Y. Oct. 25, 2005), Judge Gleeson addressed a claim that annotations on the verdict sheet violated due process. In the verdict sheet in Miller, the first degree murder count included the notation "intentional in the course of a robbery" and the name of the victim, and each of the four second degree murder counts included the name of the victim and the words "intentional", "depraved indifference," or "felony murder," depending on the specific crime charged. See Miller, 2005 WL 2757218, at *4. Recognizing that these annotations, like the ones at issue here, "were by no means complete recitations of the applicable law," Judge Gleeson nevertheless held that they were "innocuous - indeed helpful" and were "plainly included in order to assist the jury in distinguishing the numerous counts of murder with which [petitioner] was charged." See id. So too in this case, the simple notations to each count,

35

which included only the words "in the course of a Burglary" and the name of the victim, were simple and helpful in distinguishing the various murder counts and did not violate due process.

Moreover, in determining whether the annotations violated due process, "it is appropriate for a court to consider . . . the trial judge's full charge to the jury." Belgrave, 1999 WL 1007350, at *6. It is undisputed that the jury charge in this case, like the jury charge in Belgrave, contained a complete and accurate explanation of each element of the crimes charged. In particular, the trial judge explained that, to be found guilty of the murder in the charged counts of conviction, the defendant must have caused the death of the victim "in the course of committing and in furtherance of burglary." See Tr. 1651:22-24, 1665:11-12. This language precisely comports with the statutory definitions of the charged crimes. The charge also clarified that the verdict sheet was separate from the judge's instruction on the law. The trial court explained that it had been prepared "to assist [the jurors] in their deliberations" and that it "lists the choices that you can make after a careful consideration of all the evidence *in accordance with my instructions on the law*." Tr. at 1693:9-17 (emphasis added). This admonition also belies petitioner's claim that the court's failure to instruct the jury about the purpose of the notations in violation of § 310.20(2) violated due process, because the clarification, although not as precise as the language of § 310.20, nevertheless reminded the jury that the verdict sheet was not a substitution for the judge's instruction on the law. Thus, "under these circumstances, the use of an annotated verdict form briefly distinguishing among [multiple homicide counts], did not deny [petitioner] his due process right to a fair trial." See id. at *6.

36

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2) (1996), no certificate of appealability will be granted. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/

Allyne R. Ross
United States District Judge

Dated: August 15, 2008
       Brooklyn, New York

SERVICE LIST:

### *Pro Se* Petitioner

**Jerry Bonton**
# 02-A-5418
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582-0010

### Attorney for the Respondent

**Howard Barry Goodman**
Kings County District Attorney
350 Jay Street
Brooklyn, NY 11201